AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

<table>
<tr><td>In the Matter of the Search of<br><i>(Briefly describe the property to be searched<br>or identify the person by name and address)</i><br><br>Pink Samsung Cellular Phone With Assigned Phone<br>Number 626-526-3238<br>Serial Number R5CW11KV9NZ</td><td>)<br>)<br>)<br>)<br>)<br>)</td><td>Case No.  '24  MJ1646</td></tr>
</table>

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Distribution of Controlled Substances and Possession With Intent to Distribute, and Conspiracy to do so |

The application is based on these facts:

See attached Affidavit of Daniel Daugerdas, Task Force Officer / Drug Enforcement Administration, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Daniel Daugerdas*
_____
*Applicant's signature*

Daniel Daugerdas, DEA Task Force Officer
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means).*

Date:  __April 26, 2024__

_____
*Judge's signature*

City and state:  __San Diego, California__

Honorable Allison H. Goddard, U.S. Magistrate Judge
_____
*Printed name and title*

<u>ATTACHMENT A</u>
Property to be Searched

A pink Samsung cellular phone with assigned telephone number 626-526-3238, Serial Number R5CW11KV9NZ, with its associated SIM card, seized from Bryan Kim BULLARD on November 16, 2023 (the "**Target Device**").

The **Target Device** is currently in the custody of the Drug Enforcement Administration in San Diego, California.



ATTACHMENT B
Items to be Seized

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the Target Device will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, web history, files, metadata, photographs, audio files, videos, and location data, for the period of July 4, 2023, up to and including November 16, 2023:

1.  tending to indicate efforts to possess or distribute controlled substances;

2.  tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the distribution of and/or the possession with the intent to distribute controlled substances within the United States;

3.  tending to identify co-conspirators, criminal associates, or others involved in the distribution of and/or the possession with intent to distribute of controlled substances within the United States;

4.  tending to identify travel to or presence at locations involved in the distribution of or possession with intent to distribute controlled substances within the United States, such as stash houses, residences used to prepare or process controlled substances, load houses, or delivery points;

5.  tending to identify the user of, or persons with control over or access to, the Target Device; and/or

6.      tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

All of the above constituting: (1) evidence of a violation of one or more of the following offenses: 21 U.S.C. Sections 841(a)(1) and 846; (2) contraband, fruits of the same offenses or other items illegally possessed; or (3) property designed for use, intended for use, or used in committing these offenses.

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Daniel Daugerdas, a Task Force Officer with the Drug Enforcement Administration ("DEA"), being duly sworn, hereby state as follows:

## I.

## PURPOSE OF AFFIDAVIT

1.     I make this affidavit in support of an application for the issuance of a warrant to search the following **Target Device**, as further described in Attachment A:

A pink Samsung cellular phone with assigned telephone number 626-526-3238, Serial Number R5CW11KV9NZ, with its associated SIM card, seized from Bryan Kim BULLARD on November 16, 2023 (the "**Target Device**")

2.     The **Target Device** is currently in the custody of the San Diego Drug Enforcement Administration, located at 4560 Viewridge Avenue, San Diego, California. I submit that the facts contained herein demonstrate probable cause to believe that the **Target Device** contains evidence, fruits, and instrumentalities of violations of federal crimes, specifically violations of Title 21 U.S.C. §§ 841(a)(1) and 846 (possession of controlled substances with intent to distribute, distribution of controlled substances, and conspiracy to do the same) as further described in Attachment B.

3.     The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, my review of documents and records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact learned during the course of this investigation. All dates and times described are approximate.

## II.

## TRAINING AND EXPERIENCE

4.     I am presently employed by the San Diego District Attorney's Office as a District Attorney Investigator (DAI), Bureau of Investigation, and have been employed as a peace officer for over 16 years. I am currently a cross-sworn deputized federal Task Force Officer with the Drug Enforcement Administration (DEA), San Diego Field Division. I am currently assigned to the DEA's San Diego County Integrated Narcotics Task Force (NTF) Team 10, which is comprised of DEA Special Agents (SAs), Task Force Agents (TFAs) from Homeland Security Investigations (HSI), and other various Task Force Officers (TFOs). NTF Team 10 investigates illegal drug trafficking organizations (DTOs) operating within the United States and internationally, including those whose operations involve the distribution of wholesale quantities of illicit narcotics.  The focus of NTF Team 10 is the investigation of drug overdoses.

5.     Prior to my work with the District Attorney's Office and the DEA, I was a detective with the Port of San Diego Harbor Police Department and a cross-sworn federal Task Force Officer assigned to the Federal Bureau of Investigation's Major Traffickers Task Force and Cross Border Violence Task Force. With the FBI, I was a case agent on multiple Organized Crime Drug Enforcement Task Force (OCDETF) investigations, cases involving drug cartels, firearm sales and violent crime, including kidnappings and extortions, as well as working internationally with government law enforcement partners and sources on drug trafficking operations.  Additionally, while employed as a Port of San Diego Harbor Police officer and detective, I took part in drug and human trafficking maritime interdiction operations, working with the United States Coast Guard, United States Border Patrol, and San Diego Sheriff's deputies.

6.     I have made thousands of contacts and/or arrests for violations involving controlled substances.  In the course of my employment, I have become familiar with the ordinary meaning of controlled substance slang and jargon, and I am familiar with the

manners and techniques of drug manufacturers and traffickers. I have become familiar with information about how criminals use phones to plan and carry out crimes, communicate with co-conspirators, dispose of evidence, and attempt to escape prosecution.  I have participated in investigations involving undercover operations, use of confidential sources, and Title III wire intercepts. I have participated in many other aspects of criminal investigations including reviewing evidence, conducting physical surveillance, and executing search and arrest warrants.  I have interviewed state and federal defendants and witnesses while conducting these various investigations.   I have gained a working knowledge and insight into the normal operational habits of narcotics traffickers.  In total, I have received over 250 hours of formal narcotic related training.

7.     Based upon my training and experience, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in the sale of narcotics may yield evidence:

   a.     tending to indicate efforts to possess or distribute controlled substances;

   b.     tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the distribution of and/or the possession with the intent to distribute controlled substances within the United States;

   c.     tending to identify co-conspirators, criminal associates, or others involved in the distribution of and/or the possession with intent to distribute of controlled substances within the United States;

   d.     tending to identify travel to or presence at locations involved in the distribution of or possession with intent to distribute controlled substances

within the United States, such as stash houses, residences used to prepare or process controlled substances, load houses, or delivery points;

e.   tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

f.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## III.

## FACTS SUPPORTING PROBABLE CAUSE

8.   On Sunday, September 10, 2023, at approximately 12:23 a.m., San Diego Police (SDPD) officers were dispatched for a suspected drug overdose to an apartment within a complex located at 8405 Rio San Diego Drive, San Diego, California, within the Southern District of California. At 12:22 a.m., a 911 call had been placed by a then unknown male, during which he stated, "overdose, overdose," and that he was calling from "…her phone…" While the dispatcher was trying to explain life saving measures, the male stopped talking and the call ended.

9.   Upon arrival, officers met an individual identified as N.R. who directed them into his rented apartment where they located the 25-year-old female victim, D.G., laying unconscious on her back on the bathroom floor, her legs propped up on the bathtub, wearing pants, with no shirt, and a black brazier pulled upward.

10.   The first responding SDPD officer pulled D.G. from the bathroom, determined she was not breathing, and began CPR until medical personnel arrived. D.G. was later transported to Scripps Mercy Hospital in Hillcrest.

11.   FULTON told police that he had received a Facebook call from a "buddy" of his, whom he had known for a couple of years, named "Ryan." FULSTON stated that his "buddy" was no longer on scene. FULSTON said that "Ryan" had called him saying the girl they knew [D.G.] was not feeling well, which is why he was there.  FULSTON finally admitted to police that D.G. originally came to the apartment with him.

4

12.     Officers interviewed N.R., who was living at the apartment where the overdose took place. N.R. stated that he allowed a person he knows as "Bryan" over to his apartment to do laundry. N.R. stated that he was in the bedroom the whole time and did not see anything that had occurred in the rest of the apartment. N.R. said that he did not know FULSTON or D.G., and N.R. presumed that "Bryan" allowed them to come over. N.R. further stated that "Bryan" knocked on his door and advised him of someone being unresponsive. N.R. said that "Bryan" had called 911 then must have left the scene.

13.     Within the apartment, officers in plain view located a piece of foil with a brown liquid and a white chunk inside the bathroom where D.G. was found. Officers also located twelve and a-half (12.5) blue pills on the kitchen counter with M30 stamped on them. The foil and pills presumptively tested positive for the presence of fentanyl.

14.     On September 11, 2023, Team 10 was notified of the incident and that family members were at Scripps Mercy Hospital with D.G.  Investigators responded to the hospital where they learned from Intensive Care Unit medical personnel that D.G. was comatose, with no neurological responses and a low chance of survival. Medical personnel also stated that sexual intercourse may have recently occurred given they observed vaginal swelling and bruising on D.G.'s inner thighs.  Finally, investigators learned that opiates were found in D.G.'s system.

15.     Five days after D.G.'s admittance to the hospital, on Friday, September 15, 2023, investigators were notified that she was still comatose and had no improvement. D.G. was removed from life-support that evening and pronounced deceased, with the San Diego County Medical Examiner's Office being notified.

16.     Team 10 conducted an investigation, which included the execution of multiple search warrants. Among the California state search warrants executed, included one for D.G.'s cellular phone, signed by San Diego County Superior Court Honorable Judge Frederick Maguire, (#2309121631-SDDA-FXM-SW), one for Facebook date records for D.G. and Cameron FULSTON's accounts, signed by San Diego Superior Court, Honorable Judge Jay Bloom (#2309181338-SDDA-JMB-SW), one for antemortem blood and urine

collected from Scripps Mercy Hospital, signed by San Diego County Superior Court, Honorable Judge Patricia Cookson (#2310161530-SDDA-PKC-SW) and one for Facebook data records for suspect Bryan BULLARD, signed by San Diego County Superior Court, Honorable Judge Garry Haehnle (#2310111343-SDDA-AYM-SW).

17.     Investigators learned through presumptive testing of D.G.'s blood drawn upon her arrival at the hospital that it contained fentanyl, cocaine, benzodiazepines, and ethanol. Subsequent testing of D.G.'s antemortem blood by the San Diego County Medical Examiner's Office confirmed 0.73 ng/ML of fentanyl, 0.20 ng/mL of 4-ANPP (a chemical precursor of fentanyl), a detectable amount of norfentanyl, a detectable amount of alprazolam, 0.53 mg/L of benzoylecgonine, and 0.122% of ethanol. The cause of death was listed as anoxic-ischemic encephalopathy due to resuscitated cardiopulmonary arrest, with contributing factors of fentanyl, benzodiazepine, cocaine, and alcohol intoxication.

18.     Investigators met separately with D.G.'s live-in boyfriend of two years, N.S., as well as her mother, C.A-G., and sister T.G. C.A-G. provided investigators with D.G.'s cellular phone, while N.S. provided the phone's passcode.  T.G. and C.A-G. also provided a handwritten note that was located inside D.G.'s purse. N.S., C.A-G., and T.G. all related similar accounts in which they described how on Saturday, September 9, 2023, N.S. and D.G. got into an argument. D.G. left her residence in Carlsbad, California, taking a ride-share taxi to an unknown location. N.S. showed investigators text messages from his phone to D.G.'s phone, asking whom she was with. The messages went unanswered.

19.     C.A-G. repeatedly tried contacting D.G. into the following day with no response. After D.G. did not return home on Sunday, September 10,  N.S. began utilizing D.G.'s home computer, which was connected to social media applications, including Facebook. N.S. and the family messaged the username of "Cameron Fulston" on Facebook Messenger. FULSTON responded and described how he and D.G. were friends and that she came to another friend's apartment in San Diego. He described how D.G. was there for about an hour then FULSTON left to get food.  FULSTON told the family through continued messages that he thought D.G. smoked some opiates, likely fentanyl, and started

having problems breathing. CPR was administered (unknown by whom); then someone called 911. FULSTON wrote that he felt bad and tried doing the right thing by going to the hospital and dropping off her belongings. FULSTON provided the family with the address to Scripps Mercy Hospital.

20. T.G. showed investigators her own Facebook account, showing a Facebook message she had received from the username Cameron Fulston back on July 4, 2023. The message read, "hey whats going on , you still working a carlsbad bar." T.G. did not answer the message and stated that many people know her and where she works.

21. In reviewing D.G.'s phone, investigators confirmed it belonged to D.G. based on the Settings application with the Apple ID bearing her name and photograph. Investigators also observed D.G.'s Facebook and Instagram accounts within the phone, and the Facebook Messenger conversation she had with Cameron Fulston. The Facebook account for username Cameron Fulston displayed a profile picture that matched that of FULSTON's Department of Motor Vehicle identification photograph, as well as prior booking photographs of FULSTON.

22. Through the Facebook Messenger conversation between D.G.'s and FULSTON, investigators learned that earlier on Saturday, September 9, FULSTON messaged D.G. and asked if she used drugs. D.G. stated that she does "Downers mostly." FULSTON described currently smoking with his source of supply, and that the source mostly had methamphetamine and fentanyl. D.G. asked for FULSTON to pick her up because she wanted to use drugs. FULSTON clarified that he was, "…not smoking it now trying to stay away but I'll hook u up." D.G. agreed to get a Lyft to come meet with FULSTON, but she wanted to confirm, "Do you have the fetty[1] though," to which FULSTON responded, "Yeah". FULSTON provided the address of 8405 Rio San Diego Dr, San Diego, California, and D.G. provided continued updates as to how far she was away. FULSTON went on to say that if D.G. did not want to provide money for the "fetti," for her

---

[1] "Fetty" refers to fentanyl.

to "…just play around with my boi like don't need to fuck him or anything just show him some attention like be chill vibe with him talk to him a bit he'll hook it up…"

23.    As D.G. got closer in distance, FULSTON described himself in text messages to D.G. that he was wearing a white t-shirt and tan pants, then added that he had "…some fetti & foil…" After some time passed, FULSTON texted that he was out front now wearing a "black sweatshirt."[2]

24.    Through additional messages, seemingly after D.G. had arrived and met FULSTON, FULSTON then later messaged D.G. saying, "That's kinda grimy a bit like are you just feeling him like that more or what," and "I'm not trying to get jealous, but your fucking hot so ima feel some type of way if you just hook up with Bryan," then "You down for a 3sum". From reviewing D.G.'s account, those messages appeared to go unanswered, with a follow-up missed Facebook Audio Call from FULSTON to D.G. at 12:21 AM.

25.    In review of publicly available Facebook information, investigators observed FULSTON to be Facebook friends with account username "Bryan Bullard." The Facebook profile picture of the "Bryan Bullard" account matched that of BULLARD's California DMV's identification photograph, as well as prior booking photographs of BULLARD. BULLARD at that time was wanted on an outstanding arrest warrant.

26.    Through hospital personnel, investigators learned that during the day on Sunday, September 10, an individual did in fact drop off belongings for D.G. while she was admitted at Scripps Hospital. Within D.G.'s purse was the located handwritten note which stated that the person was dropping off her personal belongings and that the person had already contacted her sister. The note also said to call if she needed a ride when she got discharged and provided a phone number of XXX-XXX-4375.

27.    Through law enforcement databases, investigators confirmed the phone number to belong to FULSTON, which was provided during a past criminal investigation. Also, upon later review of camera footage at Scripps Mercy Hospital, investigators

---

[2] Investigators later learned that FULSTON was wearing a black sweatshirt when contacted by SDPD officers following D.G.'s overdose.

8

1  identified FULSTON, who had arrived at the emergency room at approximately 11:45 a.m.
2  on Sunday, September 10, 2023.

3       28.   On October 10, 2023, investigators obtained apartment complex video
4  surveillance footage from the dates and times leading up to and including D.G.'s suspected
5  overdose at 8405 Rio San Diego Drive, San Diego, California.  The surveillance video from
6  September 9, 2023, at 7:34 p.m., reflected two individuals matching the description of
7  FULSTON and BULLARD entering the 8405 Rio San Diego Drive building.  At 9:33 p.m.,
8  the surveillance video showed FULSTON and D.G. appear to meet and then both enter the
9  apartment building. The surveillance video proceeded to show the incident unfold, which
10 included police responding to the scene at approximately 12:26 a.m. and paramedics
11 responding to the scene at approximately 12:30 a.m.

12      29.   The video surveillance then showed on September 10 at 1:53 a.m., BULLARD
13 again appeared and walked up to the building's call-box. A separate still photograph was
14 taken of BULLARD from the call box, from which he was positively identified.
15 BULLARD then entered the building.  At 2:34 a.m., FULSTON and BULLARD are then
16 seen on surveillance exiting the building and walking out of frame.

17      30.   On October 11, 2023, investigators received notice from San Diego Sheriff's
18 deputies that FULSTON was taken into custody on an unrelated case. FULSTON was
19 subsequently transported to the San Diego Sheriff's Station in Vista, California.
20 Investigators responded to the Vista Patrol Station and met with FULSTON in an interview
21 room.  FULSTON was read his *Miranda* rights from a pre-printed card. Through the limited
22 interaction, it was highly suspected that FULSTON was under the influence of a controlled
23 substance and unable to answer simple questions. It was also clear that FULSTON did not
24 understand what investigators were saying, and the interview was ended.

25      31.   On November 1, 2023, investigators obtained a search warrant for continuous
26 GPS location pings for the cellular phone with assigned telephone number 626-526-3238,
27 signed by San Diego County Superior Court Honorable Judge Jay Bloom, (#2311011533-

28

SDDA-DFL-SW). In review of GPS location data for that cellular phone, investigators located an apartment in San Diego.

32.     Investigators were familiar with this building and specific apartment, it being inside the same apartment complex where victim D.G. overdosed.  Investigators learned that the renter of the apartment was on probation for firearms offenses, and also had an active fourth-amendment waiver issued in San Diego County Superior Court.

33.     On November 14, 2023, during surveillance of the apartment, investigators observed as BULLARD exited then re-entered the apartment. Two days later, on the morning of November 16, 2023, law enforcement subsequently planned a probation search at the apartment. During pre-surveillance of the apartment, law enforcement observed BULLARD exit the apartment and enter the elevator, going downstairs to the building's garage. Simultaneously, other law enforcement personnel approached the building and observed BULLARD exit the elevator and enter the garage, where he was taken into custody on the outstanding arrest warrant.  In BULLARD's hands was the **Target Device,** which was seized.

34.     Law enforcement performed a probation search at the apartment, detaining two individuals inside. During a search of the common areas of the apartment, investigators located a red Milwaukee canvas bag containing multiple clear plastic baggies with quantities of crystalline materials and white powdery and rock-like substances that indicated distribution. The narcotics were later sent to the DEA's Southwest Laboratory located in Vista, California to be weighed and tested by a forensic chemist.  Located within the red Milwaukee bag was the following:

-   Clear plastic baggie containing fentanyl with a net weight of approximately 29.6 grams;
-   Cylindrical container with two small baggies inside containing fentanyl with a net weight of approximately 17.150 grams;
-   Clear plastic baggie containing fentanyl with a net weight of approximately 4.41 grams of fentanyl;

- Clear plastic baggie containing 20.84 grams of pure methamphetamine; and

- One metal spoon with fentanyl and methamphetamine residue.

35.  Additionally, inside the Milwaukee canvas bag was a wallet containing the California identification card of "Bryan Kim Bullard," and $360 in cash. Based on my training and experience, the cash was indicative of street-level sales of narcotics, being in various denominations, specifically 11-$20 bills, 3-$10 bills, 17-$5 bills, and 25-$1 bills.

36.  While detained, but not in handcuffs, investigators asked one of the two detained individuals for consent to search her cellular phone, which was seen in plain view in the apartment's kitchen. The individual agreed, provided the passcode for the phone, and provided written consent to search the phone. Within the phone, investigators located a video, dated October 13, 2023, at 3:34 a.m., showing BULLARD hunched over in a chair, appearing to be on the apartment's balcony. In the video, BULLARD has a yellow torch lighter in his hands and a red Milwaukee canvas bag on the ground at his feet appearing to be the same as the bag recovered from the apartment containing narcotics inside.

37.  Following BULLARD's arrest, also on November 16, 2023, investigators obtained a search warrant, signed by the Honorable Judge Peter Gallagher, San Diego County Superior Court, authorizing the search of the **Target Device** (2311161208-SDDA-PAG-SW).

38.  On November 30, 2023, a three-count Complaint was filed against BULLARD and FULSTON in Case No. 23-MJ-4328-JLB, charging BULLARD and FULSTON with conspiracy to distribute fentanyl and distribution of fentanyl in violation of Title 21, United States Code, Sections 841(a)(1) and 846 and BULLARD only with possession of methamphetamine and fentanyl with intent to distribute, in violation of Title 21, United States Code, Section 841(a)(1). On February 6, 2024, BULLARD and FULSTON were arraigned on the Information charging the same three counts, and both BULLARD and FULSTON pled not guilty.  After detention hearings were held, both are currently detained. The next date is a Motion Hearing/Trial Setting is currently scheduled for May 6, 2024 in Case No. 24-CR-201-BAS.

39.     On March 14, 2024, investigators obtained federal search warrants, signed by Honorable Bernard G. Skomal, Magistrate Judge, Southern District of California, authorizing the search of FULSTON and BULLARD's Facebook accounts. (*See* Case No. 24-mj-01062-BGS).     Communications via Facebook between FULSTON's and BULLARD's accounts began on July 18, 2023 and continued up to and including messages regarding D.G.'s overdose on Rio San Diego Drive in San Diego, California.  In addition, on July 10, 2023, BULLARD sent a Facebook message appearing to indicate he was at N.R.'s apartment, referring to his first name and place of employment.  Messages through July and August indicate BULLARD's distribution of both methamphetamine and fentanyl. For example, on July 12, 2023, a Facebook user sent BULLARD a message asking "You on deck;" based on my training and experience, this is slang for inquiring whether someone is in possession of narcotics for sale.  BULLARD responded, " . . . On the run.  Yeah I'm on deck," appearing to indicate that he was on the run from police, consistent with his outstanding arrest warrant, and that he was in possession of narcotics.  As another example, in one conversation on August 7, 2023, a user asked BULLARD, "How much Fetty do you have," indicating fentanyl.  BULLARD responded, "Idk like 8 or 9 g's".  The user asked, "How much for 8," and BULLARD replied, "300," then adding "That's like 35 a g". Following these messages, BULLARD shared his location.  Based on my training and experience, I believe this exchange indicated that BULLARD was in possession of 8 or 9 grams of fentanyl and willing to sell it to that Facebook user.

40.     After D.G.'s overdose, the Facebook returns indicate that BULLARD and FULSTON continued to be involved in the sale of controlled substances in the following days and months.  For example, on September 17, 2023, at 2:02 a.m., FULSTON messaged BULLARD asking the price for "a zip."[3]  BULLARD responded "150."  Based on my training and experience, I believe FULSTON was asking BULLARD the price of an ounce of methamphetamine, and BULLARD responded that he would sell it for $150.00. Subsequently, on October 7, 2023, a female Facebook user messaged BULLARD asking,

---

[3] A "zip" refers to an ounce of methamphetamine.

"Hey what's up do you have a qp." BULLARD responded, "350." The Facebook user appeared to be attempting to purchase a quarter pound of methamphetamine from BULLARD, and he indicated that he would sell it for $350.

41.   Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics and overdose investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Device**.  In light of the above facts and my experience and training, there is probable cause to believe that the Defendant was using the **Target Device** to communicate with others to further his distribution of illicit narcotics. Further, in my training and experience, individuals who distribute narcotics may be involved in the planning and coordination of narcotics sales in the weeks, months and even years prior to an event.  Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics.  Based on the known time period of communication between BULLARD and FULSTON as well as others regarding the distribution of narcotics, I request permission to search the **Target Device** for data beginning on July 4, 2023, up to and including November 16, 2023, the date of BULLARD's arrest.

## IV.

## METHODOLOGY

42.   It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature, and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants, and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data

contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

43.     Following the issuance of this warrant, I will collect the **Target Device** and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

44.     Based on the foregoing, identifying, and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## V.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

45.     As noted previously, on November 16, 2023, investigators obtained a search warrant, signed by the Honorable Judge Peter Gallagher, San Diego County Superior Court, authorizing the search of the **Target Device** (2311161208-SDDA-PAG-SW).  I have not included any information found as a result of that warrant execution as probable cause for this affidavit.

1

2

## VI.

## CONCLUSION

3      46.    Based on the facts and information set forth above, I submit there is probable

4  cause to believe that a search of the **Target Device** will yield evidence of the Defendant's

5  violations of Title 21, United States Code, Section 841(a)(1) and 846. Accordingly, I request

6  that the Court issue a warrant authorizing law enforcement to search the item described in

7  Attachment A and seize the items listed in Attachment B using the above-described

8  methodology.

9

10 I swear the foregoing is true and correct to the best of my knowledge and belief.

11

12          *Daniel Daugerdas*
          _____
          Task Force Officer Daniel Daugerdas
13         Drug Enforcement Administration

14

15 Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P.

16 4.1 by telephone on this 26th day of April, 2024.

17          *Allison H. Goddard*

18 _____
   HONORABLE ALLISON H. GODDARD
19 United States Magistrate Judge

20

21

22

23

24

25

26

27

28